## IN RE APPEAL OF HEROULT.

---

### PATENTS.

An application for a patent for an improved process of reducing refractory oxides, *held* to have been properly rejected by the Patent Office, on the ground that the claims made had all been anticipated in a patent previously issued.

Patent Appeals, No. 4. Submitted November 12, 1894. Decided January 7, 1895.

HEARING on an appeal from a decision of the Commissioner of Patents rejecting an application for a patent. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an appeal from the refusal of the Commissioner of Patents to grant a patent, and the cause is one of those that were transferred to us from the General Term of the Supreme Court of the District of Columbia upon the establishment of this court.

The applicant, Paul L. T. Heroult, on April 10, 1889,

filed his application in the Patent Office for letters patent of the United States for an alleged invention by him of a process for the reduction of refractory oxides adapted for metallurgical purposes, and his application was accompanied with a specification of seven apparently distinct and different claims. These claims underwent numerous additions, changes and modifications in the Patent Office until they took final shape, nine in number, as follows:

"1. The process of separating and producing metals from the so-called refractory oxides, which consists in passing from a carbon electrode, through a fused bath comprising the desired oxide contained within a comparatively non-heat-conducting crucible, an electric current of such volume as to maintain the fused bath, thereby securing without the aid of external heat, first, the maintenance of a continuous fused bath in the crucible by the addition of new material, into which the electrode dips, and second, electrolysis of the oxide, as set forth.

" 2. The process of separating and producing aluminium from its oxide, which consists in passing an electric current through a carbon anode, alumina, and a carbon crucible in which the alumina is contained, the alumina being first fused by the current, and then by the continuous passage of the current through the bath thus formed and by the addition of new material, maintaining a continuous fused layer in the crucible undergoing electrolysis, all without the aid of external heat, as set forth.

" 3. The herein described electrolytic process of reducing refractory oxides and producing metals therefrom, which consists in subjecting the oxide to the action of an electric current of sufficient volume to fuse and electrolyze such oxide without the aid of external heat, and utilizing, after the beginning of the operation, the molten metal reduced from the oxide as the negative electrode.

" 4. The herein described electrolytic process of reducing refractory oxides and producing metals therefrom, which

consists in progressively fusing and electrolytically decomposing the oxide between a positive electrode of carbon and a negative electrode of the metal reduced from the oxide, said oxide and metal being both fused and maintained in a state of fusion by the electric current without the application of external heat, substantially as set forth.

"5. The continuous process of producing metals from refractory oxides adapted for such purpose, which consists in feeding the oxide without a flux into a carbon crucible, fusing the oxide and electrolyzing it by the passage of an electric current therethrough in the presence of a carbon anode, and fused metal derived from the oxide as the cathode, supplying new unfused material, and withdrawing the molten metal without interruption of the process, substantially as described.

"6. The herein described process of producing metals from the refractory oxides, which consists in fusing and collecting a fluid layer of oxide in a comparatively non-heat-conducting crucible connected to the negative pole of the generator of electricity, maintaining constant the layer of fused oxide and electrolyzing it by the passage of an electric current through it from a carbon electrode connected to the positive pole of the generator of electricity, collecting the metal produced below the surface of the fused layer, adding fresh oxide to take the place in the bath of that reduced, and thereby maintain a practically uniform fused layer undergoing electrolysis, and adjusting the electrode to compensate for its consumption and the gradual filling up of the crucible, thereby maintaining the resistance fairly constant, as set forth.

"7. The process of separating and producing metals from their refractory ores or compounds, which consists in fusing progressively and thereby maintaining a continuous fused bath of the desired material in a comparatively non-heat-conducting crucible, by a source of heat concentrated directly on the ore, as distinguished from conduction from an

external furnace, and effecting electrolysis by passing an electric current through the bath, as set forth.

"8. The process of separating and producing metals from their refractory ores or compounds, which consists in fusing progressively, and thereby maintaining a continuous fused bath of the desired material, effecting electrolysis of the material when fused, by the passage of an electric current therethrough from a carbon electrode of sufficient volume to effect the above described functions of fusion and electrolysis, without the aid of external heat, as set forth.

"9. The process of separating and producing metals from their refractory ores or compounds by the electric current, which consists in establishing a conducting path for the current through a fused portion of the ore contained in a non-heat-conducting crucible, and maintaining a continuous bath by the progressive fusion of additional ore, as well as electrolyzing that already fused, by the passage of an electric current thererethrough from a carbon electrode of sufficient volume to effect the above described functions of fusion and electrolysis, as set forth."

After numerous emendations, as already stated, and after rejection of the application by the primary examiner as being in conflict with a patent previously issued to the applicant on August 14, 1888, and reversal of this decision by the board of examiners in chief, the claims, as now formulated, and which we have deemed it proper to recite here in full, although they are several times repeated in the printed record before us of the proceedings in the Patent Office, were submitted to the primary examiner, and were by him twice rejected, on February 16, 1892, and on March 17, 1892. And the main ground assigned for their rejection was that they had all been anticipated in a patent issued to Charles S. Bradley on February 2, 1892, upon an application filed by the latter on February 23, 1883.

The examiners in chief, on April 20, 1892, affirmed the decision of the primary examiner; and on appeal from them

to the Commissioner of Patents, the latter affirmed the decision of the examiners in chief on June 23, 1892. Thereupon, the present appeal from the Commissioner was taken to the Supreme Court of the District of Columbia, and has been thence transferred to this court.

*Messrs. Bentley & Blodgett* for the appellant.

*Mr. Levin H. Campbell* for the Commissioner of Patents.

Mr. Justice MORRIS delivered the opinion of the Court:

The patent to Bradley, upon which the application of Heroult was rejected, is not set forth in the record; but a copy of it has been furnished to us, and it seems proper that the claims contained in it should be stated, so as the better to determine whether they have fairly anticipated the claims of this applicant. They are six in number, as follows:

"1. The process of separating or dissociating metals from their highly refactory ores or compounds, non-conductors in an unfused state, of which the ores and compounds of aluminium are a type, which consists in fusing the refactory ore or compound progressively by a source of heat concentrated directly upon it, rather than by an external furnace, and as it becomes fused effecting electrolysis by passing an electric current therethrough between terminals which are maintained in circuit with the fused bath, whereby the process is rendered continuous, substantially as set forth.

"2. The continuous process of separating or dissociating metals from aluminous or like highly refractory ores or compounds, non-conductors in an unfused state, which consists in progressively fusing the refractory ore or compound and as it becomes fused electrolyzing it by passing an electric current therethrough of sufficient volume to continue and maintain the fusion and effect electrolysis, and adding fresh material from time to time to preserve the bath constant, as set forth.

"3. The process of reducing metals from that class of

highly refractory ores or compounds, non-conductors in an unfused state, of which the ores and compounds of aluminium are a type, which consists in fusing a portion of the refactory ore or compound to be treated, in establishing an electric current through said fused portion, and by such current producing simultaneously progressive fusion of such ore or compound and continuous electrolysis of the same as fused.

" 4. The process of separating or dissociating aluminium from its ores or compounds, consisting in fusing and maintaining the fusion and electrolytically decomposing the ore or compound by the passage of the electric current therethrough, substantially as set forth.

" 5. The continuous process of separating or dissociating aluminium from its ores or compounds, consisting in fusing and maintaining the fusion and electrolytically decomposing the ore or compound by the passage of the electric current therethrough, and charging the bath with fresh quantities of the ore or compound as the reduction proceeds, substantially as set forth.

" 6. The process of separating or dissociating aluminium from its ores or compounds, consisting in fusing and maintaining the fusion and electrolytically decomposing the ore or compound by the passage of the electric current therethrough and regulating the strength of said current in accordance with the requirements of the fused mass, substantially as set forth."

The attempt to reduce the useful metals, and especially that most remarkable metal aluminium, from their refractory ores or compounds, principally oxides, is one which has greatly engaged the attention of scientific men for over thirty years; and De Ville and Loutin in France, Rose in Germany, and Napier and Johnson in England made considerable progress in that direction during the years from 1859 to 1886. In the last mentioned year (July 9, 1886,) Charles M. Hall, of Oberlin, in the State of Ohio, who, it

seems, had been making extensive experiments with electricity for that purpose, applied for letters patent of the United States for a process invented by him for the reduction of the oxide of aluminium by the passage of a current of electricity through a fused mass or bath, as it is called, of the refractory ore, and the production therefrom of the desired metal; and on April 2, 1889, he received such letters patent. Charles S. Bradley, of the city and State of New York, had been making similar experiments; and he also applied for and received the letters patent that have been heretofore mentioned. His application was made on February 23, 1883; but the letters patent were not issued to him until February 2, 1892.

That the invention of Bradley is substantially identical with that made at a later date by the present applicant, is quite apparent even to a casual investigator, and is, in the main, admitted by counsel for the applicant. The Bradley process is described in his patent to be one for the reduction of refractory ores—notably for the reduction of the refractory compounds of aluminium, which are taken as a type, inasmuch as aluminium is the metal most sought for in these investigations—by subjecting them to the action of an electric current passed through the mass in sufficient volume first to fuse them by force of the heat engendered by the current and to maintain them thus fused, and thereupon to electrolyze them; that is, to decompose them into their constituent elements, and to segregate the metals from their adherents. The crucible or vessel in which the ore is held in fusion is variously constituted, either of fire brick, or of a carbon slab and layer, or preferably of a body of the ore itself, excavated into the shape of a basin or receptacle. Into this basin or receptacle is placed a portion of the material desired to be fused; and through the material an electric current is passed from an anode, as it is called, or positive electrode of carbon, to the carbon slab or other vessel containing the material. This is the Bradley process;

and it does not appear that there is anything more in the process of Heroult.

It is claimed, however, on behalf of the latter, that, while Bradley must be admitted to be the prior inventor of the broad process for the separation of metals from their refractory ores or compounds by fusion of the ores and the passage of an electric current through the fused mass so as to electrolyze it, yet there are three novel features in the process of Heroult which entitle it to be regarded as a patentable invention. These three features are: 1st. Production of a certain class of metals from their oxides, which insures a substantially pure product; 2d. Carrying on the reduction process in a non-heat-conducting crucible; 3d. The use of a carbon positive electrode.

With reference to the first of these three features, we fail to find anything whatever in the record before us to indicate that the process of Heroult has any better results, or produces any purer product, than does that of Bradley, or that of Hall. There is nothing whatever to show a difference of result. The production of metals from their oxides insuring a substantially pure product, is the claim of Bradley and Hall, as well as of Heroult, and we are unable to see how it can be new with the last named.

The third of the three features, the use of the carbon anode or positive electrode, is not new with Heroult, for it is distinctly mentioned by Bradley in his specification, although perhaps not contained in his claims. Bradley in his specification says: "As a matter of fact, when the process is worked, fumes arise at the anode, but the anode is not attacked or eaten away very rapidly, provided it is made of pure carbon, such as gas retort carbon, which I prefer in preference to carbon containing silicia or alumina." So that the carbon anode was well known to Bradley and was made public by him before it was published by Heroult, if it was not published before that; and plainly, therefore,

it cannot be regarded as a patentable novelty on the part of Heroult or of any other subsequent inventor.

There remains the second alleged feature of novelty—the carrying on of the reduction process in a non-heat-conducting crucible, and for this there seems to be a better claim than for the others. There is apparently no mention of any such crucible in Bradley's patent. But the crucibles which Bradley specifies as proper for carrying on his process, and which he does not include in his claims, are, in fact, non-heat-conducting appliances. He refers specially to three, a hearth of brick, a carbon slab with a cavity in it to serve as a receptacle for the ore to be fused, and a mass of the ore itself scooped out and formed into a basin for the same purpose. But he does not limit his crucible to any of these, although he prefers one formed of a mass of the ore itself. These are all non-heat-conducting, and the carbon slab specially does not substantially differ from the carbon crucible suggested by Heroult. When a crucible, which is non-heat-conducting in fact, has been actually used and made public for reduction processes, it is not apparent how there can be patentable novelty in the suggestion of the use in general of non-heat-producing crucibles.

Moreover, the quality of carbon as a non-conductor of heat has long been known, and the application of it for the purpose of a crucible, or for any other purpose, merely on account of its non-heat-conducting quality, would not seem to be the subject of invention, but rather a mechanical appliance.

The three features to which the applicant's claim has now been reduced by his counsel do not seem to us to be the subject of invention on his part. If they have patentability, the applicant does not show himself to have been their first inventor.

We find no reason to dissent from the decision of the Commissioner of Patents in this case, *and we, therefore, affirm that decision. Therefore, the clerk will cause this opinion and the proceedings in this cause to be duly certified to the Commissioner of Patents, in accordance with the law.*